[Crim. No. 3770. Second Dist., Div. One. Aug. 2, 1944.]

THE PEOPLE, Respondent, v. JOHN M. PLANAGAN, Appellant.

Joseph Scott, J. Howard Ziemann and G. L. McFarland for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

YORK, P. J.—By an indictment presented by the Grand Jury of Los Angeles County, defendant was accused of the murder of Dorothy Marie Courtemanche on or about April 21, 1943.

Upon arraignment of defendant the cause was transferred for further proceedings to the juvenile court which court found him to be under the age of sixteen years and ordered him committed to the care and custody of the sheriff for suit-

able detention, pursuant to section 731 of the Welfare and Institutions Code. Thereafter, said juvenile court found defendant was not a fit and proper subject to be dealt with under the Juvenile Court Law, and the cause was "transferred to Department 43 for prosecution under the general law." In said Department 43 of the superior court, defendant entered his plea of "not guilty as charged in the indictment," and further pleaded that he was "not guilty of the offense charged because he was insane at the time that he is alleged to have committed said unlawful act." Three doctors were "appointed under section 1027 Penal Code to examine the defendant as to his sanity and report to the Court as to his mental condition." When the cause was called for trial, defendant by leave of court, withdrew his plea of "not guilty by reason of insanity," for the reason, as stated by his counsel, that the three doctors appointed to examine defendant "have found the boy sane."

At the conclusion of the trial, the jury returned a verdict of guilty of murder, a felony, as charged in the indictment, and found it to be murder of the second degree. From the judgment of conviction which was thereafter entered, and from the order denying his motion for a new trial, defendant prosecutes this appeal.

Appellant here urges that the judgment of conviction be reversed for the following reasons:

"(1) The absence of any proof of motive is fatal in this case where all of the evidence is purely circumstantial; and

"(2) Opportunity alone is insufficient to sustain the verdict of guilty; and

"(3) The circumstantial evidence relied upon herein is inconsistent with guilt and is only consistent with innocence; and

"(4) Reversible error was committed when Exhibit 21, a spring blade knife, in no way connected with the crime herein, was admitted as evidence; and

"(5) The evidence is wholly insufficient to support the verdict of guilty; and

"(6) Grievous error was committed in admitting evidence of a childhood incident occurring six years before the date of the crime charged herein, and wholly unconnected with the crime herein; and

"(7) The district attorney was guilty of gross misconduct prejudicial to the defendant; and

"(8) The motion for a new trial should have been granted."

The case is one of circumstantial evidence, and because appellant's statement of facts is somewhat abridged and therefore inadequate for a proper understanding of the circumstances attending the homicide, this court has reviewed the evidence set forth in over 1200 pages of the reporter's transcript, and finds that respondent's brief summary of the evidence produced is a fair statement of the facts as disclosed by the record:

Mrs. Courtemanche and her three children, Marilyn, Pete, and the deceased child, Dorothy Marie, who was commonly called Doris, for eight years had lived in the downstairs portion of the old Sepulveda home at 751 North Palos Verdes in the city of San Pedro, located on a mesa above the Wilmington-San Pedro Road, directly across from the Los Angeles Shipbuilding Corporation. The father died in November, 1942. Mrs. Eva Worden with her husband and children occupied the upstairs portion of the house and had lived there five years previous to the homicide, the property being owned jointly by the two families. Since the death of Mr. Courtemanche, Mrs. Courtemanche had been working in Torrance, leaving home at 7:15 o'clock in the morning and returning about 5:00 o'clock in the evening. Marilyn Courtemanche was also employed, and usually left home at 12:00 or 12:30 o'clock in the afternoon returning about 4:30. Doris, the deceased child was twelve years of age, and Pete, her brother, was fourteen.

The Planagan family consisted of the father, who was acting Captain of Fire Boat No. 3 of the Los Angeles Fire Department at San Pedro, the mother, appellant, who was fifteen years of age, 6 feet 3 inches tall and weighed 175 pounds, and William, thirteen years of age. They lived at 450 Donald Street, San Pedro, which was about four-tenths of a mile from the Courtemanche home. The Planagans had lived there since 1923 and the children of the two families played together and visited each other's homes. Pete Courtemanche and appellant were pretty good friends until about a year before the homicide. Appellant "was always horsing around," would get Pete down, get his "arm and twist it,

or something like that,'' which Pete did not like, therefore he stayed away from appellant. One time while Pete was standing out in front of his house, appellant was playing around with a knife and put it to Pete's back and started fooling around with it, pushing it hard against Pete's back, but did not cut him. Pete had not seen appellant at his (Pete's) house for three months prior to April 21, 1943, the date of the homicide, which occurred during the Easter vacation week. At school Pete had seen appellant with a push-button knife and later with a hunting knife, which appellant carried in the zipper pocket of his black leather coat. This was about three months before the homicide. The blade of the hunting knife was about 5 inches in length with a dark red handle and a crossbar or guard. The blade was about an inch wide and appellant carried it in a scabbard.

Frank Cordero, fifteen years of age, who lived at 319 North Mesa, went to the Courtemanche home nearly every day after school. He and Pete played together. Appellant used to come to his home and they would go to Pete's house. This was about three months before the murder. Appellant went around with bigger boys. Frank had seen appellant with a hunting knife with a blade about 4½ inches long; which was sharp on one side and had sort of a red and black handle with an aluminum tip, and was carried by appellant in the side zipper pocket of his jacket in a leather case. Sometimes Pete tried to avoid appellant. When Frank and appellant went to Pete's on their bicycles, they would go across the lot on the path, and appellant would go to the front door and whistle for Pete.

On Monday night, April 19, 1943, Mrs. Courtemanche heard appellant call Doris several times. Mrs. Courtemanche went to an open window, looked out and saw appellant underneath the window of Doris' bedroom. She asked him why he was calling Doris and appellant said he was not calling Doris but was calling Pete. She told him that Pete was going to bed and for him to go home, and appellant replied "All right," very snarly and surly. After the first two or three months that the Courtemanche family lived there, appellant came to their home regularly and played with the children. This continued for a year and a half. At that time, or approximately six years before April 21, 1943, the date of the homicide, Mrs. Courtemanche talked with appellant at her

home and told him not to return. He remained away for at least two years, and when he returned she noticed that he had grown quite a bit. On seven or eight other occasions she had sent appellant home and believed she had not seen him for a year prior to the time in question.

On April 20, 1943, around 11:00 o'clock in the morning Mrs. Worden's daughter Betty, thirteen years of age, went downstairs to the Courtemanches where she stayed about an hour and a half. Appellant was sitting on the couch and Doris was knitting. Only the three were there. Doris, the murdered girl, received a telephone call from a boy friend and she asked appellant if he thought she should go with this boy to the park. Appellant said, ''Oh, I don't think so. Why don't you wait a few more years before you go out with the boys?'' Appellant ruffled Doris' hair and when she combed it, he ruffled it again, all in a friendly mood; Doris not being angry at him for doing it. Appellant did not look wild-eyed or crazy or all ''worked up,'' but as a playful schoolboy with a schoolgirl.

On this same day, April 20th, Marilyn Courtemanche arrived home from work at about 4:30 o'clock, and Mrs Courtemanche and Pete came home about 5:45 o'clock in the afternoon. When Marilyn came into the house she saw appellant in the front room. Doris was there, and in the presence of appellant, Marilyn told Doris that she had to go to work the next day in the morning instead of the afternoon and did not know how long she would have to work, probably late. She told Doris she wanted her to get some things downtown, some darning cotton, and Doris said O.K. The next morning Marilyn left home at 8:00 o'clock and returned at about 1:00 o'clock in the afternoon. As hereinbefore mentioned, it was Easter vacation week.

On April 21, 1943, the day of the homicide, at about 9:00 o'clock in the morning, Pete Courtemanche and Frank Cordero went to Cabrillo Beach at San Pedro and stayed until around three o'clock that afternoon. On that same morning at 9:00 o'clock, Doris asked Mrs. Blevins, who lived in a court at 266 Settle Street, San Pedro, if her son Richard could go to town with her. Richard got ready to go with Doris. In the meantime Doris went home, then returned to the Blevins house and they left there at 9:15. Around 9:30

or 9:45 that morning, appellant came to the house of Mrs. Cordero, mother of Frank, in an automobile and called for Frank. She went out and told appellant that Frank was not at home, and that he had gone to the beach with Pete. Appellant asked her if they had gone on the bus and she said yes, to which appellant replied, ''Well, that's what I thought.'' She told appellant they had gone only a few minutes before and appellant said, ''O.K., thanks,'' and left. At 10:20 that morning Mrs. Blevins and Mrs. Stiff, who lived in the same court, left home to go to town on the bus. As the bus stopped, Doris and Richard got off, this being the end of the bus line. At 11:00 o'clock, Mrs. Worden's daughter, Betty, saw Doris by the white fence in front of the house; and at 11:25, that morning, Mrs. Olson, who lived on the corner of Driefus and Settle Streets, saw Doris with her dog going through two courts to Driefus Street, about a block from Doris' house. Mrs. Olson was going up Settle Street on her way to town to meet her husband, and paid no attention as to which way Doris was going, whether away from or toward her home.

Mrs. Stiff's children, James, eight years of age, and Melanee, eight years of age, and some other children, were playing on the steps of the back porch of their home at 266 Settle Street while their mother and Mrs. Blevins had gone to town. James and Melanee knew appellant and saw him riding his bicycle on the sidewalk through the court to the path which leads across the vacant lots to Doris' home. Melanee stated she saw appellant shortly before lunch time and thought it was about 11:00 o'clock; that she had not had her lunch and didn't get it until her mother came home. Mrs. Stiff testified she arrived home around noon. At about 11:30 o'clock on this same day, Mrs. Worden came downstairs to hang up some clothes which she had washed that morning, and while going to the rear of the house she saw appellant coming through a vacant lot toward her .house on his bicycle. She paid no further attention to him. After hanging up the clothes, which took 15 or 20 minutes, she went back upstairs. At the time she came downstairs she did not notice the playing of the radio in the Courtemanche home, but as she returned upstairs the radio was playing music very loud. The entrance to the upstairs is on the south side of the house.

Between 11:35 and 12:10 o'clock on this day, April 21, 1943, Mrs. Nolton who lived at 266 Seventh Street, about one block from the Courtemanche house, was pulling weeds in her yard, but she did not notice appellant and could not say whether he passed her premises or not. Between 11:30 and 12:00 o'clock, Mrs. McKenzie, who lived at 229 Settle Street, while looking for gardening tools in her yard, heard an unusual laugh of a feminine voice and she looked toward the Courtemanche house but saw no one. Mrs. McKenzie was interested in the Courtemanche family, because she knew the mother worked. About 20 or 30 minutes later, she saw Robert Courtemanche standing on the porch looking toward the Courtemanche house. She did not see appellant.

Robert Courtemanche, the twenty-seven-year-old brother of Doris, who lived at 722 Gulf Avenue, Wilmington, arrived at the Courtemanche home with his wife and two children at 12:28 o'clock, for the purpose of getting some wire to make rabbit hutches. He stepped up onto the front porch, looked through the main window in the front of the house and saw a body lying in front of the divan in the living room. He immediately entered the house, the door being unlocked, and telephoned for an ambulance and the police. Before the police arrived, his wife and oldest son came into the room, and his wife went on upstairs to Mrs. Worden's. He did not think he lifted or removed any part of the covering over the body. The police came in about ten minutes and examined the purse lying beside the body. When the officers went through the purse, Robert Courtemanche was then sure it was his sister, Doris; up to that time he was not sure who it was. Nothing in the room was disarranged; the radio was on but inaudible, and the gas heater was burning.

Officer Gannon of the San Pedro Detective Bureau, with Lieutenant Elliott, arrived at the Courtemanche home between 12:35 and 12:40 o'clock, on the day of the homicide, at which time two uniformed police officers were there. Officer Gannon saw a body under a blanket near the divan about 10 feet from the front door. There was a wrench lying to the left of the body near the left heel. This wrench was identified by Pete Courtemanche as one of the wrenches he had used in repairing his bicycle in his bedroom the previous day and which he had left on the dresser in his room which is next to the front room. Officer Gannon noticed a spot of blood about

12 inches in diameter on the cushion on the south side of the divan extending over to the second cushion. There was a smaller spot on the back of the divan near the cushion which was about 4 inches long and 2½ inches wide. There was a puddle of blood between the two right-hand cushions, one directly on the arm, and considerable blood on the breasts of the victim. A loose leaf of the telephone book with numbers on it and a brown leather pocketbook were partially under the body.

Dr. Wilmoth, Receiving Hospital Surgeon at San Pedro, arrived at the Courtemanche home at approximately 1:00 o'clock. He made a cursory examination of the body, which was covered, and discovered that death had occurred before his arrival. There was blood on the neck of the girl and on other parts of the body, as well as on the divan. The blood was more or less liquid, not having completely coagulated. In his opinion the girl had died within an hour before he examined the body, which was beginning to get a little bit stiff with *rigor mortis*. He did not take the cover off the body and made no further examination of it. Upon cross-examination, Dr. Wilmoth admitted he was not prepared to say that death had not occurred an hour and a half before his arrival.

On the day of the homicide, Ray Pinker, forensic chemist for the Los Angeles Police Department, went to the Courtemanche home and removed the couch cover from the body in the presence of several detectives. He found there was a large blood stain in the center of the cover where it was in contact with the body which stain had soaked through the cover; that the stains were still wet, the blood not having thoroughly dried. This witness also saw the wrench which was lying on the floor to the left of the body. Due to its soiled and rough surface, the wrench did not retain fingerprints of any kind. Mr. Pinker examined the walls and ceiling of the room to determine whether or not there was any blood contamination and found none, at least none that could be seen with the naked eye.

Dr. Clinton Thienes, called by the defense as a witness, found human blood on a shade of a floor lamp, on a doorpost about 5 or 6 feet above the floor and on wood casing of an archway 5 or 6 feet above the floor.

The autopsy performed on the body of Doris showed **four**

penetrating stab wounds and two superficial stab wounds on the front of her body and four stab wounds in the back. On the left side of her head were seven wounds, three of which resulted not only in lacerations to the scalp, but depressed fractures of the skull. The brain tissue was contused and there was subdural hemorrhage. The cause of death was stab wound of the heart and compound depressed fractures of the skull. The wrench found at the scene of the crime fitted into the depressed fracture areas of the skull. The stab wounds could have been caused by a hunting knife about the size of seven-eighths of an inch to an inch at its maximum, near the handle, sharp on one side and rounded on the other. The hymen was of small type and was intact. There was no evidence of any sexual attack upon this girl.

Ray Pinker, forensic chemist, was present at the time the autopsy was performed by Dr. Webb. Tests were made by him and Dr. Webb by having various portions of the wrench in close juxtaposition to the penetrations of the skull in an effort to discover whether or not the instrument could have been responsible for the injuries sustained by the victim. They discovered that the peculiarity of the penetrations in the skull and the wounds in the scalp matched the curved portions of this wrench, namely, the upper end jaw of the wrench. They found that the curved portion was the portion that fitted exactly into the skull fracture in two places. Mr. Pinker observed that the wounds on the body had been caused by a sharp instrument, approximately one inch wide, similar to a knife blade.

On April 22, 1943 the day after the homicide occurred, appellant's father, John Planagan, Sr., called at the office of Chief Alderson of the Los Angeles Fire Department at 217 So. Hill St., Los Angeles, to seek his advice because of certain things his son had told him. Mr. Planagan, after introducing his son, who accompanied him, asked Chief Alderson if he had read about the murder in San Pedro. The chief recalled having seen newspaper headlines to that effect and told the boy that there was no way he could help him or advise his father unless he spoke the truth and told him just what it was all about. Mr. Planagan stated that he was on vacation, it being Easter week, and that he had been painting his house; that his son had been helping; that on the day

of the murder his son had either not painted at all or had stopped painting sometime in the middle portion of the morning; that he had released the boy from working and that he was then free to play or do what he saw fit. The boy (appellant) then picked up the story and stated that two of his playmates, a boy named Frankie and a boy named Pete, the latter being the brother of the deceased child, had planned to go swimming down on the waterfront, and that he wanted to go with them but due to the work at home, it had not been possible for him to go; that this particular morning when there was no more work to be done, he thought he would try to catch them to go swimming with them; that he got on his bicycle and as he left the house his mother gave him a utility bill to pay, either the gas bill, the light bill or the water bill, and told him to pay it before he came home; that he went to the home of Frankie and learned from Frankie's mother (Mrs. Cordero) that Frankie had gone swimming with Pete (Courtemanche); that he (appellant) stated that possibly he could catch the boys at Pete's house and go with them; that he rode his bicycle from Frankie's house to Pete's house across vacant lots; that he put his bicycle up against the side of the (Courtemanche) house and called for Pete; that there was a lady who lived upstairs (Mrs. Worden); that she came down with a basket of clothing to hang out on the line in the backyard; that he did not speak to her and she did not speak to him; that he called for Pete a couple of times and no one appeared; that he then looked through the window on the side of the house and saw an object on a divan which appeared to be covered; that protruding from it he saw a foot in an odd position which aroused his curiosity and made him feel that there was something wrong; that he went to the front and rang the doorbell but no one answered; that he tried the door which was unfastened, and then opened the door and entered the room. Chief Alderson asked appellant if that was not an unusual thing to do, and his father volunteered the information that they had known one another for possibly eight or ten years; that the children visited back and forth in one another's homes; that the people from Pete's home ran through his house and had since they were little tots, and that the Planagan children ran through Pete's house. Appellant told Chief Alderson that it was not unusual for him to walk into the Courtemanche house, and picking up the

story from that point, he said that he went to the divan; that the body or object was covered with a blanket or a throw of some kind; that he raised the coverlet and it was very bloody; that blood was dripping or running from it and the child's body was exposed there in front of him. Chief Alderson asked the boy to tell him just what he saw and the boy held his hands close together and held his head down and shook it from side to side, closing his eyes, giving the impression that he wanted to erase from his memory what he had seen. Chief Alderson let the boy compose himself for a moment and then asked him to state what had happened. Appellant stated, "Well, I don't know. I must have gone screwy. I don't know what I did. . . . I recall that the radio was playing, and I intended to shut the radio off, and I went over to the radio, but whether I shut it off or not, I don't know. . . . I don't know what made me do it, but I wanted to get out. I wanted to get away from there." The boy said he went outside, got on his bicycle and started to ride away. Chief Alderson asked him whether anyone saw him leave the house and the boy said that there was a lady (Mrs. Nolton) across the street, possibly two-thirds of a block or a block down the street who he was sure saw him as he left on his bicycle; that he knew her and she knew him, but she didn't get along particularly well with the kids and so he just rode on by; that he was positive that she looked at him and saw him; that he rode his bicycle for several blocks toward San Pedro; that he felt sick and upset and wanted to go home; that he turned and went home, went in the house and to his own room, sat down, and felt sick to his stomach and nervous and upset; that he did not know what he was doing; that his mother came in and asked him what was the matter and he gave her no answer; that she told him, "You are ill or there is something wrong with you. You better lie down on the bed. You are sick"; that he lay down on the bed for awhile and still felt bad; that he felt that if he got out of there and went somewhere and did something he would feel better, so he went to one of the schools and played a game or two or three of handball; that he came back home again; that his mother served dinner; that his father was not home; that he couldn't eat his dinner; that his mother attempted to make him eat but he had no appetite; that this thing was in front

of him there, and everytime he thought about it, why it made him sick, so he decided that if he went to a moving picture show, sat through a movie, maybe that would get his mind off it and he would feel better, so he went to a movie, came home and went to bed. Mr. Planagan picked up the story from there and told Chief Alderson that he came home about eight o'clock at which time his wife told him there was something wrong with Jack. "He came rushing in the house today and went in his room. He was sick and upset and I made him lie down and then he went on and came back and wouldn't eat any dinner and he has gone to a movie. He won't talk. He won't tell me what is the matter with him." So Mr. Planagan decided that when the boy came home he would question him; that Mr. Planagan stated that when the boy came home he went to his room and to bed; that Mr. Planagan was puzzled how to approach his son; that there had been a murder in the neighborhood; that the boy had acted in an odd manner, had refused to tell his mother what was wrong with him, and he was therefore a little reluctant to approach the boy and question him; that the boy had been a good boy and had never given him any trouble; that it was a terrible thing for a father to walk up to his son and begin to question him as to whether or not he had been involved in a murder; that he postponed talking to the boy and lay down himself but was unable to sleep, became nervous, the mother was crying and they put in a rather bad night without getting much, if any, sleep; that he went to the boy's room once or twice with the intention of waking him but did not do so because he just lacked the approach as to how to bring this thing up for discussion, but he did examine the boy's clothing. Chief Alderson asked Mr. Planagan if the boy had worn the same clothing all of this time, if he had made any effort to change his clothing or hide it, and Mr. Planagan said no, that the boy wore the same clothing that he had, some old trousers and shirt and a leather jacket in which he had been painting and on which there were a considerable number of paint stains, that he had worn the same to the handball court, the movies and home again; that he (the father) had examined the clothing and was not positive whether there were any bloodstains on it because of the paint and one thing and another, but rather imagined that he could detect in one or two places some indication of blood

which rather upset him and the mother; that when morning came the boy arose and he (the father) approached the boy and told him he wanted to know what was the matter with him and wanted him to explain his actions on the previous day; that the boy was a bit hesitant to talk, but upon insistence the boy related the same story to him (the father) which he had just related to Chief Alderson in his presence.

Chief Alderson asked the boy if he ever had any difficulty in school and both he and his father said he had not; that the boy had always gotten along well with his lessons and never had any trouble with the other children or anything of that kind at all. The father then asked Chief Alderson for his advice and was told by the chief that there was only one thing to do and that was to talk to the police officers and have the boy tell the story to them; that if the boy's story was the truth, he could be of material assistance to the police officers; that his presence at the scene of the crime would eventually be discovered, and that if the boy's story was not true, why then it was the father's duty to report it to the police anyway. The boy stated that was exactly what he wanted; that he wanted to get this off his mind and get the thing cleared up. The father was entirely agreeable and the chief told him that he would call the police department and ask them to send someone over. Chief Horrall of the police department was at lunch and Chief Alderson talked to Captain Harrison, who referred him to Inspector Bruce Clark. Chief Alderson told the latter that he would like him to come to his office personally; that he had some information in connection with this case which he did not wish to disclose over the telephone. In a very few minutes Inspector Clark came to Chief Alderson's office and he introduced the inspector to both Mr. Planagan and his son, outlining briefly what the boy had told him. Inspector Clark, after questioning the boy and making some notes, said that there was only one thing to do: go to the police department and get in touch with the officers making the investigation and tell his story to them, let the boy go with the officers to the house where the murder had occurred and reconstruct what he had done. The inspector inquired if the boy's clothes were available. He was not wearing the clothes he had worn the previous day, and Mr. Planagan told the inspector that the clothes were available; had not been

disturbed; were at home and he could have them. With that they left Chief Alderson's office.

Inspector Clark asked appellant if he had a hunting knife and the boy said he had. His father stated, "Yes, I spoke to him about the knife this morning, and the boy told me this morning that the knife had been stolen from him about a week previously." Inspector Clark asked the father if that was the first time he had heard of it, and he said, "Yes, this morning was the first time I knew the knife was missing." Inspector Clark asked the boy if he was wearing the same clothes that he was wearing on the day before, and the father said that he was not, that on the previous day he had worn the leather jacket. Inspector Clark asked the father if he had observed any blood on the jacket and the father said, "Yes, there was a smear of blood on his sleeve, the sleeve of the leather jacket." The three of them walked to the City Hall and Inspector Clark called in the investigators of the homicide squad to talk to the father and son.

Officer Hurst, one of the investigating officers, was told by Inspector Clark that Mr. Planagan had brought his son to Chief Alderson's office and he (Clark) had brought the boy and his father to the City Hall, and that the boy had visited the Courtemanche home on the day before and found the body of the murdered girl. Officer Hurst questioned appellant in the presence of Captain Rasmussen and the forensic chemist, Ray Pinker. Officer Hurst said to the father, Mr. Planagan, Sr., "We would like to talk to the boy now, Mr. Planagan, you can stay if you like." Mr. Planagan replied, "No, I would rather go out in the hall, I feel a bit nervous." Officer Hurst asked appellant to tell him of the occasion of his going to the Courtemanche home on the previous day. Appellant stated that he rode there on his bicycle about noon, parked his bicycle at the rear of the house and went to the front door and called for Pete; that he got no response so he looked in the window and saw something on the floor; that he went into the house by the front door and noticed a body on the floor covered with a blanket, with one foot protruding from under the blanket and a white sandal on the foot; that he heard the radio playing when he went in; that he lifted the corner of the blanket and saw the body of Doris Courtemanche and that he "blacked out"; that he then got on his bicycle and rode toward town and eventually reached home and took a

nap; that later that day he went to town, paid some bills, came back, played three or four games of handball with his brother and went to a show that night. Officer Hurst asked him how he was dressed when he went to the Courtemanche home, and appellant stated in a black leather jacket, a pair of cords and some sandals. Officer Hurst asked him where the clothing was and appellant stated it was at his home. Officer Hurst then asked appellant if he notified his parents of what he had seen and he stated that he did not notify them until the morning of the 22nd. Officer Hurst asked appellant if, after he had found the body on the floor, he thought to call a doctor or call for help, and appellant stated that he did not. Officer Hurst asked appellant if he was the owner of any knives and he stated that he owned three but had lost one, and described these knives as, one, a pocket knife with a spring back and one a hunting knife. Appellant stated he owned the hunting knife for about two months and carried it to school in his coat pocket, and that the reason he carried the hunting knife to school was because he had to have a spring-back knife. Officer Hurst asked appellant if he had notified his folks or told anybody else that he had lost his knife and appellant stated that he had not.

Immediately following this conversation on April 22, 1943, (the day following the homicide,) Officer Hurst and Ray Pinker took appellant by automobile to the San Pedro Police Station, Officer Hurst having previously telephoned that he was leaving for San Pedro and that he had appellant with him. They were met at the San Pedro Station by Captain Rasmussen, Lieutenant Elliott, Sergeant Gannon and Officer Hargett of the San Pedro Detective Bureau. Ray Pinker, Captain Rasmussen and two detectives from the said bureau went to appellant's residence, where they were met by Mr. and Mrs. Planagan, appellant's parents. The black leather jacket worn by appellant was hanging on the back of a chair in the living room and this was turned over to Mr. Pinker. He also received from Mrs. Planagan a pair of corduroy trousers, a pair of shoes, and also a white shirt and a pair of white shorts, both of which latter garments Mrs. Planagan said she had washed the evening before. No blood was found on the shoes. Mr. Pinker took the leather jacket to the crime investigation laboratory and examined and analyzed certain

stains appearing on it. On the left front portion of the garment, an area near the zipper and down near the bottom of the garment, Mr. Pinker found sixteen small spatter stains, not smears, which he analyzed to be bloodstains. These stains were on the exterior of the garment. Because the jacket was black in color and the blood red, it is very difficult to see these stains with the naked eye, and for that reason Mr. Pinker marked the location of these stains with particular bits of red cellophane paper. On the left sleeve there was a red streak. Inside of this streak he found in excess of forty tiny microscopical dried blood spatters. On the outside of the left sleeve there were smears which came as a result of contact with a bloody object and the brushing over of spatters before the spatters had an opportunity to thoroughly dry. One smear was so heavy and pronounced that in bright light, such as daylight, it could be seen as a reddish haze over the black background. There were five or six spatters somewhat larger than the other tiny spatters. On the cuff of the right sleeve of the jacket, Mr. Pinker found smears of blood covering the surface of the leather jacket which had soaked into the thread stitching of the coat at the sleeve. Inside of this particular sleeve and extending up as high as three inches on the inside of the sleeve and soaked into the lining he found stains of blood. These stains were of human blood. There was a zipper pocket appearing on the lefthand side of the front portion of the jacket. On the inside of this pocket, on the blue lining, Mr. Pinker found eight spots of human blood. One spot was quite large and could be seen easily with the naked eye. He could not say whether these spots were smears or spatters or simply contact spots because of the fact that the fabric was absorbent in character and consequently the original shape of the stain had disappeared, and had been absorbed into the fabric. Spatters mean a fine spray of microscopic tiny drops of blood flying through the air and contacting a nonabsorbent surface. Mr. Pinker found human blood on the trousers over the right side pocket and over the right rear pocket. Mrs. Planagan indicated that the trousers she gave Mr. Pinker were the ones she thought Jack (appellant) had been wearing. Appellant had described to Mr. Pinker a pair of corduroy trousers with a tear in the vicinity of the left knee which tear was present. There was contamination of blood inside that

tear, which blood Mr. Pinker did not analyze to determine whether or not it was human blood.

In the late afternoon of April 22nd, (the day after the homicide occurred,) Officer Gannon had a conversation with appellant in the presence of Officer Hargett. Appellant was asked by Officer Gannon how he figured in the Courtemanche case to which appellant replied that he had been working on the roof, helping around the house during the Easter vacation with his brother; that sometime around 11:30 o'clock on April 21st, he had a very queer feeling in his stomach; that he crawled down off the roof, went in the house and took a bath, got on his bicycle and went over to the Courtemanche house. Officer Gannon asked appellant the route he took and appellant said he took a short cut; that he left his bicycle against the Courtemanche garage and in passing from the garage to the house on the south side he saw Mrs. Worden out in the back hanging up clothing; that he went around the side, up on the porch and called for Pete; that he thought he called two or three times while he was walking toward the front door, and when he reached the front door he called again; receiving no answer, he looked into the small side window adjoining the door and saw somebody under a blanket; that he saw a white foot sticking out and so, instead of calling again, he opened the door and went in; that he did not remember whether the dog was there or not; that he picked up the corner of the blanket, looked under it, saw some blood and knew it was Doris; that he picked up the blanket 18 inches or so and dropped it; that his stomach turned a flip-flop; that he went out the front door closing it; that the radio was playing; that he did not remember whether the gas heater was on or off; that he got on his bicycle and instead of going back over the path by which he had come, he went to Settle Street; that he saw a woman standing on her porch on Settle Street; that he did not stop to tell her what he had seen; that he did not tell Mrs. Worden; that he took this different route because he was all "balled up," and gestured like he was sick to his stomach; that when he got home his mother and brother were there; that his mother asked him what was wrong and he told her that in going down a small grade at First and Mesa he struck a woman while riding his bicycle; that he did not give the woman his name; that he was upset; that there might

have been some blood on his clothing; that he removed his trousers and went to bed, leaving his jacket on the chair, and took a nap for about ten or fifteen minutes; that he got up and walked around the house; that his brother was still working about the place; that shortly thereafter his mother asked him to take the car and go to the creamery and get some milk; that he and his brother drove down there; that he did not tell his mother what he had seen at the Courtemanche house because he didn't feel very good; that after returning home with the milk, he and his brother went to the Barton High School and played four games of handball and then returned home and had dinner; that they took the local newspaper of San Pedro; that after dinner his mother mentioned about what she had read in the newspaper and stated she had known Doris and remarked what a terrible thing it was; that he didn't tell his mother that he had been to the Courtemanche home that noon because he didn't feel very good; that after dinner he and his brother Bill went to the Barton Hills Theatre and saw Joe E. Brown in a comic; that neither on the way to or from the theater did he tell his brother anything about it; that he liked the comedy; that after the show he and his brother went home and went to bed; that the next morning his father asked him if he had seen anything of what happened to Doris Courtemanche, and he said yes; that his father asked him if he was over there at noon, and he said yes, and that was when he told his father what he knew about it; that his father decided to take him to see Chief Alderson. Officer Gannon asked appellant if he had a knife, and appellant said yes he had had three or four knives; that he had had a hunting knife but had lost it either Thursday or Friday before Easter week; that he had been playing basketball at school and had left it in his leather jacket with his fur lined gloves and lost them; that the knife and gloves were not in his jacket when he got back; that he had a spring-blade knife with about three and one-quarter inch blade that he used around the house for different work; that the hunting knife had about a three and one-half inch blade with a vari-colored handle and a leather scabbard with a half-inch strap around the top; that he carried the knife just to have it; that he had never had any trouble with it; that he carried the knife in the zipper pocket of his leather jacket and it just fitted in there nicely, snugly;

that he bought the knife about three months previously from Roy Hook on Seventh and Pacific Avenue in San Pedro (a merchant). Appellant stated that no other person had worn his leather jacket except on one occasion when he let his brother wear it from school.

At the police station on April 22nd, Mrs. Planagan in the presence of appellant stated that when Jack came home from the Courtemanche house he was suffering from shock. Officer Gannon asked her just what she meant by shock and she said it must have been the shock of what he had seen over there. Officer Gannon said to her: "Well, playing handball and going to shows and enjoying the comics, that is not an indication of shock is it?" She said: "I don't know, but the boy was very badly shocked." Mrs. Planagan also told Officer Gannon that she had given Jack some bills that morning to pay and that he didn't pay them; that he was supposed to go down later in the afternoon; that he didn't pay them in the morning.

Officer Hargett's testimony relative to this conversation with appellant was in substance the same as testified to by Officer Gannon, except that Officer Hargett testified that appellant stated that the story he told his mother of hitting a woman with his bicycle was a falsehood, and that he had told his mother that story so she would not worry about his condition. Officer Hargett asked appellant who his friends were, and appellant stated that he usually ran around with Pete Courtemanche and Farnk Cordero. He asked appellant if he knew where they were on the day of the homicide and appellant said that early in the morning he had gone to Mrs. Cordero's home and was told by her that Pete and Frank had gone to the beach about 9 o'clock; that at this time he was on his way to the ferry landing where he was to meet his father to give him the key to their automobile. Officer Hargett asked appellant if he thought that picking up the blanket in the manner stated by him had splashed blood on his jacket, and appellant said that stranger things had happened.

On April 23, 1943, forensic chemist Ray Pinker had a conversation with appellant in the San Pedro jail, at which detective Gannon was present and a jailer was present part of the time. Mr. Pinker had with him appellant's leather jacket which was identified by appellant. Mr. Pinker asked appellant

whether or not, in view of the fact that there was contamination of blood on the jacket, he would like to look at a couple of photographs of the scene of this crime as they found it, with the blanket covering the body, to see whether or not he could pick out for him the particular corner of the blanket which he had lifted in order to view the sandals of the victim. Appellant said he would like to see the photographs. Mr. Pinker had copies of some photographs, People's Exhibits 13a and 13b, which he showed to appellant. Appellant looked at the photographs and then pointed to a spot on one photograph and said, ''This is the corner that I picked up.'' It was the corner of the blanket lying on the floor approximately one foot from the right hand of the victim. There was a small space between the right hand and the blanket. Mr. Pinker told appellant that that particular corner of the blanket had no blood contamination on it; in fact, none of the four corners of the blanket was contaminated with blood; that detective lieutenant Hurst and himself, and all of them there, not only lifted that corner of the blanket but removed the blanket from the body and turned the body over without any of them becoming contaminated with blood. Mr. Pinker said to appellant, ''Now, is it your explanation that any blood appearing on that jacket came as the result of contamination from lifting the blanket?'', and appellant said that it was. He said to appellant, ''Jack, there is something peculiar about the stains on this jacket, not only can the blood be identified from the stains by an examination of the stain but also in identifying the means or manner in which the contamination took place. In other words, Jack, there is a difference in the appearance from a smear stain and a spattered stain. Now, there is a bottle of ink.'' A bottle of ink and a pen were set before them. Mr. Pinker poured some of the ink onto a piece of paper and made a small pool, then he dipped his finger into the pool and smeared and wiped his finger on another piece of paper and designated that to appellant as being a smear type of stain. Then he took the pen and dipped it in the ink, held the pen up above a piece of paper and flicked a drop of ink from the pen point on the paper and showed him the type of splatter it would make. It left a crown shaped spatter which he pointed out to appellant. He then threw another drop of ink from the pen against the wall and partly at an angle, showing appellant how blood acted. He stated to appellant that from examination

of these three types of stains it is possible to determine how each was made and from what particular angle the ink came; that blood acted in the same fashion, and he showed appellant the jacket and the areas where he found numerous blood spatters. He showed appellant the left portion of the jacket and said, "Jack, this area has a number of spatters, not smears, but spatters on it." He showed appellant the left sleeve and said, "Jack, on this at the time we found it there are numerous spatters. . . . There are numerous spatters and in addition we found smears. I want to know what is your explanation for these blood stains, the spatter stains on this jacket." Appellant said, "I have no explanation to make." Mr. Pinker said to appellant, "This jacket was an eye-witness to that crime. This jacket is going to testify to the facts that I have told you about. I will have to interpret its testimony, true. You are playing a sucker game if you think your phony story can compete with the microscope and test tubes." Appellant said, "Well, you know strange things happen, sometimes. I read of a story where a person committed suicide with a gun. A bullet had previously become lodged in the barrel of this gun and when they shot themselves the gun kicked back behind a davenport and an innocent person was prosecuted for murdering that person because of that bullet having stuck in the barrel." Mr. Pinker said to appellant, "Jack, you read that in a story. Ofttimes the simple facts of one paragraph or two is enlarged to 10 or 12 pages in a story, and sensational angles are purposely injected in a story in order to make the reading interesting; that probably the true facts of that particular case that he read about are quite simple, and no doubt there have been extortions in the story. . . . A common example of that are these horror moving picture plays in which a murder is committed, and each of us attempt to pick out the criminal during the course of the filming of the picture, and we are always mistaken. The least suspected person, the person who appears to be the most innocent usually turns out to be the guilty person." Appellant said, "Well, I have not had that happen to me. I only saw three chapters of the Grand Central murder case, and I was able to pick out the criminal without any difficulty." Appellant then asked Mr. Pinker, "Is it possible for these stains to have got on my jacket from a pool of

blood?'' Mr. Pinker replied, ''No, Jack, the only pool of blood was underneath the body, and it was on the floor and protected by the body. The only additional large stain was a large stain on the blanket covering the body, this being an absorbent type of material it had absorbed the blood, and the blood could not be there. . . . Furthermore, this particular blood when it contaminated this jacket was fresh blood. It had not yet coagulated. Perhaps you are familiar, Jack, with the rate or the speed with which blood coagulates and dries. Perhaps sometimes you have injured yourself, you have cut your finger or you have observed someone else do it, and you perhaps have noticed that the blood coagulates anywhere from a minute to five minutes.'' Appellant said, ''That is right.'' Mr. Pinker repeated, ''The blood at the time it had contaminated this black jacket had not yet coagulated.'' Appellant made no reply. Mr. Pinker then asked him if he had anything to add to what he had told them and appellant said he had not. Whereupon Mr. Pinker said, ''Well, think it over, Jack, you are in as deep as you can get in at the time. I may come back and talk to you a little bit later, if there is anything that you can say that might help us clear it up, now is the time to say it. If there are any extenuating circumstances, maybe there might have been some self-defense involved here, it is up to you to tell us what happened in order that you can answer and help, and now is the time to tell your story and clear your conscience.'' Appellant made no reply; he whistled. Mr. Pinker asked appellant if he had in mind that it was necessary for him to dispose of, how would he dispose of that knife. Appellant said he would throw it in the weeds. Mr. Pinker said, ''Well, now, suppose there were not any weeds convenient or handy for such disposal, what is the next thing you would do with a knife?'' Appellant replied: ''I would throw it in the ocean.'' Mr. Pinker said, ''Well, now, supposing you were not near the ocean and you were not near weeds, how would you dispose of the knife?'' Appellant said, ''Well, I would hide it in the most obvious place where you would look at it and would not be able to see it.'' At that time Officer Gannon said, ''Like on the City Hall steps, eh, Jack?'', and appellant replied, ''Something like that.'' Appellant then said, ''I recall a public enemy once hiding from the FBI and working in a garage next door to the FBI.'' Mr. Pinker said to appellant, ''Now, Jack, name me an obvious place, some

place that I might look and not see it or anyone might look and not see it." Appellant said, "That would depend on the circumstances and upon different things." Mr. Pinker said, "Well, give me an obvious place, name an obvious place." Appellant said, "On the roof." Mr. Pinker asked appellant to lift his trousers on his left leg in order that he might see whether or not he had a wound there. Mr. Pinker found such a wound which corresponded to the general locality of the tear in the trousers given to him by Mrs. Planagan. The wound was scabbed at the time, deep enough to indicate that it had bled at the time of the injury.

On April 24, 1943, the officers took appellant in an automobile to the Courtemanche house and they asked appellant to direct them over the route he had taken on the day of the homicide. The officers had searched that route before, also the general vicinity, empty lots and whatever could be hiding places for knives. When a place came to their attention and they thought there might be something hidden there, they would get out of the machine and search for the knife, but none was found. They returned to the San Pedro police station and later took a ride to measure the distance by the automobile speedometer. They drove from the corner of the Planagan home on the route appellant stated he had taken after he viewed the body of Doris on April 21, 1943, and the distance was 1.2 miles. The route appellant took from his home to the Courtemanche home was 0.4 of a mile.

On April 27, 1943, forensic chemist Pinker had a talk with appellant at the crime investigation laboratory of the Los Angeles Police Department. He said to appellant, "Jack, in an effort to explain the picture of these blood stains on this jacket consistent with your theory of innocence, think hard now. Is it possible that at the time you arrived at the scene this body was still moving around; it was still in motion, and the result of that movement blood could have been splattered or splashed on you?" Appellant said, "Yes, that is possible." He said to appellant, "All right now, Jack, let's go one step further. Is it possible that the body may have been in a different position than it was shown in the photograph that I showed you several days age, the position in which we found the body? Is it possible that the body, as an example, was lying on the davenport and that it rolled or fell to the floor?"

Appellant said, "No, it was on the floor." Mr. Pinker said, "Well, let's begin over again. To that first question what is your answer? At the time you arrived on the scene was the body moving or was the body still?" Appellant said, "The body was still." He said to appellant, "To the second question, what is your answer, Jack, was the body lying on the floor or was it lying on the davenport or elsewhere when you came to that scene?" Appellant said, "It was lying on the floor." Mr. Pinker said, "How come you let me find that jacket with all the blood stains on it, Jack?" Appellant said, "Oh, I knew there were blood stains on that jacket." He said to appellant, "When did you first know that there were blood stains on that jacket?" Appellant said, "Oh, it was that day or the next day." He said to appellant, "Why didn't you wash the blood stains off of that jacket?" Appellant said, "Well, you can't wash blood off. Blood is blood." Mr. Pinker had no further conversation with appellant.

On April 27, 1943, between 5 and 6 p. m., in the San Pedro jail, Officer Hargett talked with appellant. He asked appellant: "Do you realize that you are involved in a serious offense?" Appellant said, "Yes." He said to appellant: "You realize that the evidence against you is strong to connect you with the crime, and in view of those circumstances, and in view of the fact whether you win or lose this case in court that it is going to be a great burden on your parents, it is going to cost them a lot of money and attorney's fees, and probably cost them their home and all of your father's savings, and in view of that fact why don't you tell me where I can find this knife, clear up this case and make a breast of things and get it off of your conscience?" Appellant meditated awhile and stated: "If I did that I would be cutting my own throat. I fell very confident in this case, and I think in a few days I will be out of here." Officer Hargett rejoined, that "I didn't think I would take it too lightly." Appellant stated that he could get a job later and pay back his father, and said, "I couldn't produce this knife without producing two other articles of evidence." Officer Hargett said to appellant, "Well, why don't you show me where I can find them, or come and take a ride with me and show me where I can find them and clean this case up?" Appellant waited awhile and Officer Hargett said, "Will you tell me where I can find

them?'' Appellant said, ''They will be found in the simplest place. You could be looking at the place and never suspect them being there.'' Appellant said, ''You know all the kids in school are for me, and I go with a nice girl, Mary Ruby. She can prove to you that I am a gentleman, and I have a lot of confidence, and I am sure I will come out of this case O.K.'' Appellant also said, ''You know I pulled a fast one on my brother. He doesn't know anything. Although he and I fight quite a bit I wouldn't tolerate anyone picking on him.'' Officer Hargett said to appellant, ''Jack, I would think that over and give this thing some serious thought. You can save your folks a lot of trouble.'' Appellant said, ''You know I could put a feather in your cap. I could make you a lieutenant if I dared.'' The officer asked appellant to give him some information as to where the knife could be found, and appellant just sat silent. He told appellant to give the matter some serious thought and if he decided on anything to get in touch with him. At that or at a previous conversation, appellant asked him if he were tried on this charge and acquitted, could he be tried again, and the officer told appellant no, that he would be once in jeopardy. At this point appellant stated, ''When this is all over I will look you up and show you a brain twister.''

Mrs. Planagan, mother of appellant, called as a witness by the defense, testified that appellant had a pair of fur-lined gloves which she believed were given to him the Christmas before. She also testified that she knew appellant did not have his knife on the Sunday prior to the homicide, that ''his brother Bill wanted to wear his coat to the show and sometimes they traded coats. He wore Bill's sport coat and when he did Bill wore the leather jacket if he wanted to, and he was going to wear it, and he knew that Jack carried his knife in there and he didn't want to wear it with it, so he was going to take it out but it wasn't in the coat.'' She also testified that on the day of the homicide ''It was about 11:30 when he came down off the roof and he took a bath and talked to Bill on the roof awhile, but he didn't paint. Then he came in and was going to one of the places. I don't remember, because when he went to one he usually went to both, so I told him as long as he was going down there I wanted him to go on downtown and get his boots. He left them downtown to

get them half-soled, and I wanted him to pay the telephone bill and the gas bill and he said he would and I got the bills. They were up on the mantel where I always keep bills that are unpaid. He wanted to put them in his billfold which he carried in his right hand hip pocket, and riding his bicycle I was afraid he would lose his wallet and all, so I reached over and said I would put them in the zipper pocket. He was combing his hair in front of the mirror, and I reached over and unzipped the zipper of the pocket and put the bills in there . . . and I put the money in with them. . . . There was no knife in the pocket. . . If there had been a knife in that pocket I could not have gotten the bills in there. . . .He had had a knife, but just recently I hadn't noticed it.'' Mrs. Planagan testified that it was five minutes to twelve when appellant left the house. Appellant's brother Bill testified that ''When he (appellant) got down to the telephone company I saw him take the bills out of his zipper pocket, where he usually carried his knife, but his knife wasn't there then. The bills were in an envelope and he took the bills out of the envelope and crumpled up the envelope and put it in his front pants pocket and went in and paid the bill.'' According to the testimony of Bill Planagan, he and appellant rode their bicycles to town to pay the utility bills sometime after lunch in the afternoon of April 21, 1943; visited Kinney's clothing store, went back home and from there to the Barton Hill school grounds where they played handball for an hour or so.

Appellant took the stand and testified that his folks had given him black gloves for a Christmas present; that he bought a hunting knife at Roy Hook's on Seventh Street in the December previous to the homicide, which knife had a purple and blue mixture handle, a couple of lines around it, and he believed it must have been around 5 inches long but he didn't know how wide it was; that he used it to cut bales of paper at the Examiner paper office in San Pedro, which place he kind of looked out for; that on Thursday or Friday before April 21st he missed his gloves and knife while walking home from school; that he carried the knife in the zipper pocket of his black jacket; that he got the tear in the left knee of his pants while playing basketball the week before Easter; that he fell down and skinned his knee; that what Chief Alderson testified to was what he (appellant) told him; that he did not kill Doris

Courtemanche, nor use a knife or wrench on her; that when he saw her that morning she was dead; that he recalled Sergeant Hargett's testimony regarding the knife and that when the Sergeant asked him where the knife was and he replied: "If I told you that I would be cutting my own throat"; he thought the officer was kidding and "I thought I would kid with him"; that they were both kind of joking. Appellant also testified that he was not in the Courtemanche home about 4:30 in the afternoon of the day before Doris' death, as testified by Marilyn Courtemanche, and did not see her on that day. On cross-examination he admitted that Sergeant Hargett said to him, "Do you realize that you are involved in a serious offense?" Also that Sergeant Hargett said to him, "In view of these circumstances and in view of the fact whether you win or lose this case in court, it is going to be a great burden on your parents, it is going to cost them a lot of money and attorney's fees, and probably cost them their home and your father's savings, and in view of the fact why don't you tell me where I can find this knife and clear up this case and make the best of it and get it off your conscience?"; that appellant said it might cost a lot of money; that in a few days he would be out and could get a job later and pay back his father. Appellant denied that he said that he could not produce this knife without producing other articles, but that he did say: "You would want the other things with it, too"; and that Sergeant Hargett said "Yes." Appellant further testified that at that time Hargett hadn't mentioned anything but the knife; that he (appellant) "was just making up a big story of it. I was kidding"; that he didn't take the fact that he was in jail accused of murder very seriously; that at that time he did not have the knife and told Sergeant Hargett that he could not produce the knife without producing other things; that he could not even produce the knife; that he didn't know where the black fur gloves were; that he missed them on Thursday or Friday before the death of Doris, which occurred on a Wednesday; that he told Hargett, "They will be found in the simplest place, you could be looking at the place and not suspect them being there." That he was just kidding Hargett; just made that up; that Mr. Pinker asked him where he would hide a knife if he had one, and he had said, "Well, I would throw it

away or throw it in the ocean or hide it in the simplest spot,'' and Gannon said, ''Like on the jail house stairs?'', and he (appellant) said, ''Yes.'' Appellant admitted he was in the Courtemanche home the day before Doris died; that he had just come from Frankie's home and it was after 3:00 o'clock, then said he did not know what time is was but guessed it was about the middle of the afternoon; that he was not there around noontime; that he knew Betty Jane Worden; that Doris mentioned that she received a call from somebody while Betty Jane was there; that he had two spring knives; that he had thrown one of them away and guessed the other was at his home; that Chief Alderson's testimony was a fair statement of all that he (appellant) saw and all he knew about the circumstances, except that he did not tell Chief Alderson that after he left Frankie's house he went over to Pete's house; that he did not tell the officers he went directly from his home to his father's place to give him the keys to his automobile; that at the time he went to the Courtemanche house, he put his bicycle against the side of the garage; that Mrs. Worden came down with a basket of clothing when he was coming toward the Courtemanche house; that he called for Pete while he was on the front porch; that he looked through the window and saw an object which appeared to be covered; that he thought something was wrong, the radio was going and nobody answered; that he didn't ring the doorbell; that a blanket was all over the body; that he lifted the blanket; that he didn't remember whether blood was dripping or running from the coverlet; that he wasn't sure whether the body he saw was that of Doris Courtemanche; that he guessed a murder had been committed; that he did not remember how long a time elapsed from the time he saw Mrs. Worden until he walked out the front door, whether it was as much as half an hour or not; that he did not tell Mrs. Worden what he had seen; that he saw Mrs. Nolton when he was going away from the Courtemanche house; that he did not make an outcry after he left the house; that he felt very sick at his stomach; that he did not know whether he was trembling all over; that he didn't remember what his mother said when she met him in his house; that he wanted to go home because he felt kind of weak; that he had not a clear recollection of all that took place while he was inside the Courtemanche house on that day, and not certain of all the things that he has stated; that he

was not certain about what part of the "rug" he picked up off the body; that he met his mother in the house when he came back from the Courtemanche house, but did not remember what his mother said to him, and thought that his mother told him he was sick or ill when he talked to Chief Alderson; that he was not sick or ill to his knowledge when he talked to the police officers; that he remembered going to the school-yard and playing a game or two of handball; that he wanted to go to the picture show to get away from what he had seen at the Courtemanche house; that up to that time he had not told anybody what he had seen at the Courtemanche house; that he was afraid he might be accused of murder; that he had a faint recollection of his mother asking him about an accident with his bicycle, hitting a woman down on First and Mesa; that it never occurred to him to tell Mrs. Worden about the awful thing that had happened downstairs; that it did not occur to him to use the telephone then and call the police; that he had known Doris for many years, since she was five or six years of age, and liked her, but did not remember whether he examined the body enough to see if it was Doris; that he knew that Mrs. Courtemanche worked; that he saw it was a girl's body; that he did not tell anybody and didn't know why he did not tell his mother; that he and his father were pals and he didn't tell his father; that he wasn't afraid of his father's accusing him of murder; that he didn't want to bother or worry his father with something like that.

On redirect examination, appellant testified that he thought Officer Hurst was a pretty funny guy, "He tried to pin it on me right away"; that he thought Officer Hurst was crazy and he would not trust him as far as he could throw a bull; that he never had any sickness and prior to April 21st his appetite was enormous, he ate three meals a day and meals in between meals.

On recross-examination, appellant was asked if he had told the officers that he had no explanation when they asked him about blood on his clothes, to which he replied: "No, why should I tell them anything? I don't trust them anyway."

In connection with the first point raised upon this appeal, appellant urges that since his identification as the person who committed the crime was based solely upon circumstantial evidence, the question of motive "becomes par-

ticularly and cogently material''; and that the only evidence of any motive on his part to commit the alleged crime was a childhood incident happening six years before the date of the homicide, which evidence was erroneously admitted over his objection.

On this question of motive, it is stated in volume 1 of Wigmore on Evidence, 3d ed., p. 559, as follows: ''It is sometimes popularly supposed that in order to establish a charge of crime, the prosecution *must show a possible motive.* But this notion is without foundation. Assuming for purposes of argument that 'every act must have a motive', i. e. a prior impelling emotion (which is not strictly correct), yet it is always possible that this necessary emotion may be undiscoverable, and thus the failure to discover it does not signify its non-existence. The kinds of evidence to prove an act vary in probative strength, and the absence of one kind may be more significant than the absence of another; but the mere absence of one kind cannot be fatal. There must have been a plan to do the act (we may assume); the accused must have been present (assuming it was done by manual action); but there may be no evidence of preparation; or there may be no evidence of presence; yet the remaining facts may furnish ample proof. The failure to produce evidence of some appropriate motive may be a great weakness in the whole body of proof; but it is not a fatal one, as a matter of law. In other words, there is no more necessity, in the law of Evidence, to discover and establish the particular exciting emotion, or some possible one, than to use any other particular kind of evidential fact.'' Citing *People* v. *Durrant,* 116 Cal. 179 [48 P. 75], and *Pointer* v. *United States,* 151 U.S. 396, 413 [14 S.Ct. 410, 38 L.Ed. 208], the latter case holding: ''The law does not require impossibilities. The law recognizes that the cause of the killing is something so hidden in the mind and breast of the party who killed that it cannot be fathomed; and, as it does not require impossibilities, it does not require the jury to find it. Yet, if they do find it, it simply becomes an item of evidence in the case, which is only evidentiary at best,— that is, it is only an item of evidence going to show whether a particular party may have committed an act, and sometimes going to show the characteristics of that act. It is not indispensable to conviction that the particular motive for taking the life of a human being shall be established by proof to the

satisfaction of the jury. The absence of evidence suggesting a motive for the commission of the crime charged is a circumstance in favor of the accused, to be given such weight as the jury deems proper; but proof of motive is never indispensable to conviction.'' When the perpetration of the crime has been brought home to the defendant, the motive for its commission becomes unimportant. (*People* v. *Durrant, supra.*)

''The establishment of a motive for the commission of a homicide is not essential to support a conviction, but the presence or absence of motive, whether weak or strong, is a circumstance bearing upon the guilt or innocence of the accused. Thus, while proof of motive is never indispensable, it is always permissible and often valuable. The prosecution may advance any theory within the range of human experience and reasonable probability, as to motive, and support it by appropriate evidence.

''Considerable latitude is allowed in the reception of evidence on the question of motive. It is settled that evidence having a direct tendency, in view of the surrounding circumstances, to prove motive on the part of a person to commit the homicide, and thus to solve a doubt either as to identity of the slayer, the degree of the offense, the insanity of the accused, or to the justification or excusability of his act, is admissible, however discreditably it may reflect upon the defendant, and even where it may show him guilty of other crimes.'' (13 Cal.Jur. 685, § 74, and cases there cited, including *People* v. *Greig,* 14 Cal.2d 548, 561 [95 P.2d 936]; *People* v. *Larrios,* 220 Cal. 236, 251 [30 P.2d 404]; *People* v. *Aranda,* 12 Cal.2d 307 [83 P.2d 928]; *People* v. *Hall,* 27 Cal. App.2d 440 [81 P.2d 248]; *People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631].)

██ From this it would appear that failure to prove motive is not fatal in a prosecution for murder where the conviction is based upon circumstantial evidence. ██ Moreover, since the testimony elicited from the mother of the deceased child with respect to the so-called childhood episode was apparently permitted to be introduced in an attempt by the prosecution to prove a motive for the crime, its admission under the foregoing rules of law was not erroneous.

When appellant objected to the introduction of this evi-

dence, a discussion was had between counsel and the trial court outside the hearing of the jury, at which time the court stated: "If your object is to show that the defendant was put on notice by the mother not to bother her children, if that is what your intention is, and that you can argue an inference that the boy knew that he was not wanted around there, and that sort of thing, I think that probably would be proper to do, but not directly or indirectly to attempt to get from this witness any details of why the mother made that sort of order, unless it is opened up on cross-examination in the guise of showing bias, motive and prejudice, and then, of course, if it is, I would let you go into it on your redirect examination." It was then brought out from the mother of the victim that six years before the homicide, she had told appellant not to return to her home; that he remained away about two years; that he then came to the Courtemanche home three or four times a week up to about a year before the homicide and that there were times when she (Mrs. Courtemanche) sent appellant home; that sometimes she would permit him to play there with the children when she could watch them; that she had not seen him very often in the last year until quite recently; that she never found him there with Doris when she came home from work, but that he undoubtedly was there when she (Mrs. Courtemanche) was not at home; that on one occasion only during the period of six years did she consent to appellant's coming to her home and that was when he had some ice-cream and her children begged her to let him come in so they could eat the ice-cream, and that she said he could. The only inference the jury could have drawn from this direct evidence was that appellant knew Mrs. Courtemanche did not want him coming to her house and that she watched him when he was there. Therefore, its admission, as heretofore stated, did not constitute error, as urged by appellant under point numbered six.

Appellant also makes the point (numbered seven) that the district attorney's reference to the said childhood episode in his opening and closing arguments to the jury constituted "gross misconduct prejudicial to appellant," in that "said prosecuting attorney constantly emphasized and reiterated prior but nonexistent inimical conduct on the part of the defendant of an unexplained nature."

The phraseology particularly objected to follows: "We will

show you by the evidence in this case as we go backward——
we are now speaking as to the motive, which the Court will
tell you is not necessary in the proof of a case but is often
helpful to those who can prove motive, the motive being to
show why a thing is done and existing in the mind only of the
person concerning whom the inquiry is made and capable of
performing it by his own declarations and circumstantial evi-
dence. We will prove to you that for six years or more this
defendant had been unwanted at the . . . Courtemanche home;
that when he did come, that if Mrs. Courtemanche was there
he remained very briefly because we will prove to you that
Mrs. Courtemanche had ordered him to go on home and stay
and to never come back upon those premises and had threat-
ened him with punishment if he ever did return. . . . Thereby
we will establish to you that this defendant knew at the time
of which we speak that Mrs. Courtemanche entertained toward
him feelings of hostility of the character of which I have
spoken to you, and we will further establish in connection
with and as a fact affecting the motive in this case, which we
will ask you to consolidate with all other proof in this case,
this circumstance: Six years before the date of this occurrence,
at the time when the girl was but approximately six and a half
and . . . this defendant was approximately but nine and a
half years of age, Mrs. Courtemanche ordered this defendant
to get off those premises and to stay and never return. That
will be testified to here before you. There is evidence in this
case that the little girl came screaming to her mother from
the upper floor of the garage on these premises where the
defendant was, a short distance back of her, and cast herself
into her mother's arms and told her mother certain things.
Her mother walked up to Planagan and took him by the arm
and told him, 'Planagan, don't ever come on these premises
again. Don't you ever put your hand on any of my children',
and then reached up and twitched his ear. She said, 'Do you
feel that? I don't know what I should do to you to make you
understand, but if you ever come back here and touch one of
my babies again I will cut that ear off. Now you get out and
stay out.' From that moment on Planagan was unwanted
on the place and knew it.'' Again, the prosecuting attorney
told the jury: ''. . . We will prove to you that death came
upon this girl directly and unexpectedly without any attempt

on her part to flee, at the hands of a person, who, in order to cause her death at that moment to protect himself from the results of something that he had done, and that the stab wounds that are described to you are not the result of sadistic tendencies of an insane person but the severity of the infliction of the blows due to terror at the time, and terror of the doer over the very seriousness of his act." In his closing argument to the jury, the district attorney stated: ". . . In that period of a year before last April, while Mrs. Courtemanche was at work, in that period of time, this defendant came there, and he must have had in his mind that Mrs. Courtemanche did not want him there. *He knew and she knew why, but it is enough to know that she didn't want him there.* He knew she didn't like him and I have every reason to infer, and I believe you are justified in the inference that *when she said that during those occasions he remained around the premises and she was watching him she took the occasion to let him know that she was watching him and he was aware that she was watching him.* . . . Let's consider that statement in the light of what we come back to know about this case, and I ask your indulgence, if you think I am taking too much of your time, because if you find this boy guilty, you are going to take quite a lot of his time. *There is going to be quite a lot of time in that community, when the parents of girls whom he knows will not have to wonder if he is coming to their house if you find him guilty, and if you find him innocent there will be throughout all time down to the beginning of eternity itself, there will be in San Pedro the impressive body of the little girl who is dead in her blood and her girlhood, which was uncalled for, unjustified and remains unavenged.*"

At the very beginning of his statement, the prosecuting attorney warned the jury that anything he said should not be considered as evidence in the case; and at the end thereof stated that he had outlined the case "simply for the purpose of permitting you to see . . . the theory of the prosecution . . . not to have you consider as evidence what I have told you but to be able to sit in and piece the evidence bit by bit." Appellant's counsel at no time excepted to the remarks of the prosecuting attorney, either in his opening or in his closing argument to the jury.

It is the duty of counsel making a statement to state

the facts fairly and to refrain from stating facts which he cannot or will not be permitted to prove. (*People* v. *Stoll*, 143 Cal. 689, 693 [77 P. 818].) ■ An opening statement is supposed to be an outline of what the People intend to prove. The failure to do so, either on account of the rules of evidence or for any other reason, does not necessarily indicate prejudice. It is the substance and implication of a statement, or the effect of an act which determines what the law recognizes as prejudicial misconduct.

■ Applying the foregoing rules of law, the prosecuting attorney did not commit prejudicial misconduct in his opening statement to the jury when he referred to the specific details of the childhood episode which occurred six years prior to the homicide and which, under the ruling of the trial court hereinbefore mentioned, he was not permitted to prove by the witness Courtemanche.

■ As stated in 4 Cal.Jur. 10-Yr. Supp., 1943 revision, p. 767, *"The scope of comment by the prosecuting attorney* extends to facts that have been established by cross-examination, as well as those that have been proved by direct examination. The permissible range of discussion of the merits of the case, both as to the law and the facts, is comprehensive. The attorney may discuss and argue questions of law, excuse or condemn the motives of actors, and advance any theory that finds support in the evidence. The credibility of witnesses may be assailed by him, if credibility has been impeached by evidence, by inconsistencies or incoherence of testimony, by the witness's manner of testifying, by the appearance of the witness while testifying, or by circumstances. Again, the prosecuting attorney may argue that the crime was committed in any manner that the evidence shows reasonably possible. He may denounce a theory of the defense, refer to things that have been seen by the jury while viewing the premises, speak of articles that have been exhibited to them, and comment respecting the instrument with which the crime was committed—although it has not been formally introduced in evidence. . . . In addressing the jury, the prosecuting attorney should restrict the scope of his statements to matters that are within the record. He should not attempt to evolve any theory or to introduce into the case any feature that is not fairly and reasonably justified by the evidence." (Citing numerous authorities.)

■ It is only where the district attorney refers to matters not in evidence or expresses his own conclusions which are not founded upon evidence, or where he indulges in unwarranted attacks upon defendants or interferes with the orderly processes of the court in some way, that his alleged misconduct in argument to the jury may be construed to be reversible error. (*People* v. *McKenzie,* 12 Cal.App.2d 614 [55 P.2d 1200].)

None of the remarks of the prosecuting attorney to the jury herein comes within that category of prejudicial misconduct which would warrant a reversal of the judgment.

Although appellant does not raise the question of error in denying instructions requested, or of error committed in the giving of instructions, nevertheless, because of the remarks of the prosecuting attorney with respect to the childhood episode, hereinabove quoted, we think it proper to state that the following instruction was given by the trial court:

"You are the sole and exclusive judges of the weight of evidence and the credibility of witnesses, and it is your function to determine all questions of fact arising from the evidence in the case. It is the right of court and counsel to comment on the failure of defendant to explain or deny any evidence against him, and to comment on the evidence, the testimony and credibility of any witness; yet the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of witnesses.

"But while you are the sole and exclusive judges of the facts and of the weight of evidence, you are to judge of the facts upon the testimony and other evidence produced here in court. If any evidence has been admitted and afterwards stricken out, you must disregard entirely the matter so stricken out, and if any counsel has intimated by questions which the court has not permitted to be answered that certain things are, or are not true, you must disregard such questions and refrain from any inferences based upon them. If counsel, upon either side, have made any statements in your presence concerning the facts in the case, you must be careful not to regard such statements as evidence, and must look entirely to the proof in ascertaining what the facts are. If, however, counsel have stipulated or agreed to certain facts, you are to regard the facts so stipulated to as being conclusively proven.

If either party has during the trial admitted any fact or facts material to the matters involved in this case, such admission is to be deemed by you as proven against the party making such admission."

The trial court refused to give appellant's requested in- struction:

"The District Attorney in his opening statement said that there would be evidence presented in this case that 'the little girl had come screaming to her mother from the upper floor of the garage on those premises where the defendant was, a short distance back of her, and cast herself into her mother's arms and told her mother certain things. Her mother walked up to Planagan and took him by the arm and told him, Plana- gan, "Don't you ever come on these premises again. Don't you ever put your hand on any of my children" and then reached up and twitched his ear. She said, "Do you feel that? I don't know what I should do to you to make you understand, but if you ever come back here and touch one of my babies again I will cut that ear off. Now, you get out and stay out." From that moment on Planagan was unwanted on the place and knew it.

"You are instructed that no evidence or testimony has been adduced to establish these facts which the District Attorney stated he would prove, and that there has been a failure of proof in this respect. For this reason you are instructed to entirely and absolutely disregard the statement of the District Attorney as to these facts, nor are you to draw any inference that these facts may be true."

 It would have been improper to give the requested instruction in the form proposed, because the following direct evidence was introduced which tended to establish *some* of the facts which the prosecuting attorney stated he would prove:

"Q. (by Deputy District Attorney to Mrs. Courtemanche, the mother of the deceased child) : I want to be sure that you answer just what is asked of you and no more and no less. Mrs. Courtemanche, on one occasion approximately 6 years before this date of April the 21st last did you talk with Jack Planagan at your own place? That question is to be answered yes or no. A. Yes. Q. Now, at that time in that talk did you say anything about whether or not Jack Planagan, this defen- dant, was to be or come upon those premises at any future

time? Just answer yes or no. (Objection by defense counsel overruled.) A. Yes. Q. By Mr. Veitch: Now, in that conversation what did you say to him? Did you tell him to return or tell him not to return, which of the two? (Objection by defense counsel overruled.) A. Not to return. Q. By Mr. Veitch: After that talk did this defendant continue to return to your premises? A. No sir. Q. For about how long did he continuously remain away from your premises? A. I imagine at least 2 years. . . . Q. Well, after such period of time what did you observe of this defendant returning to your home or being around the premises? (Objection of defense counsel overruled.) A. I noticed that he had grown up quite a bit. Q. By Mr. Veitch: No. What did you notice about him being around the premises, first? You say you did see him around the premises or upon the premises of your home? A. After the 2 years? Q. Yes. A. Yes sir. Q. Now, how frequently would it occur in that period of which you are now speaking that you saw Jack Planagan in or around your premises? A. Well, 3 or 4 times a week. Q. On those occasions at that time had you as yet gone to work? A. No sir. Q. Got yourself a job? A. No sir. Q. When did you first start in to go to work and get yourself a job? A. A year ago last April. Q. Well, how long did it continue that this Planagan boy would be around those premises as you say 2 or 3 times a week, up to about when? A. Well, when school started he wouldn't be there quite so often, just now and then, but not often. Q. Up to how long before the 21st of April last year was it that you saw Planagan now and then, perhaps 2 or 3 times a week, in or upon the premises? A. I can't give the definite number of times. Q. That is not quite what I intended to ask you either. Up to about how long ago was it that Jack Planagan continued to come or that you would from time to time see him upon your premises as you have said perhaps 2 or 3 times a week? Is that question clear to you? A. Yes, I believe it is. Then answer it. (Objection of defense counsel overruled.) . . . A. Well, I guess about a year ago. Q. By Mr. Veitch: Now, during this period of time when he was coming to the house perhaps 2 or 3 times a week, to the premises, did you say anything to him about being around the place on any of those occasions? (Objection of defense counsel overruled.) A. There were times when I sent him home. Q. By Mr. Veitch:

Well, how frequently would it transpire that you would send him home? (Objection of defense counsel overruled.) . . . A. Well, 7 or 8 times. The Court: Mrs. Courtemanche, sometimes when the boy would come over there you would not send him home? A. Not always. Q. Sometimes you would let him play there with the children, wouldn't you? A. Yes sir, when I could watch them I would. Q. And other times you would get tired from having him around and say 'Go on home', was that it. A. No sir, that was not the reason. The Court: All right, go ahead. Q. By Mr. Veitch: Now, about a year ago what happened in respect to Planagan coming around the place? Did you see him after that or not? A. Yes, I have seen him but not very often in the last year until quite recently. Q. Well, when you say quite recently you mean rather recently during the spring time of this year? A. Yes sir. Q. Did you see him during this year before the Easter vacation of school around your place. A. No, I don't believe I did. Q. Now, did you ever come home from your work and find Jack Planagan there with Doris and Pete? A. No, I didn't come home from work and find him there. Q. Did you ever come home in this period of several months, now, well, let's say before the time this terrible thing happened, during the year before then, did you ever come home from work anywhere and find him there? A. I suppose I may have. I can't remember of him being there in the evening but undoubtedly he was there when I wasn't home. Q. No, you don't understand my question. Did you ever come home from being somewhere at work or downtown during that year before April 21st and discover that this defendant was there with your children at the house? When I say discover, I mean see him there with your children at the house. A. No sir. . . . Q. During that whole period of six years to which you have just referred did you at any time invite or ask this defendant to be in or upon the premises, your home? (Objection of defense counsel overruled.) . . . A. I only consented once to Planagan coming into my home. Q. When was that? A. He had some ice cream and my children begged me to let him come in so they could eat the ice cream and I said he could. . . . Q. By Mr. Veitch: Other than that one occasion of which you have spoken, did you ever invite or consent to the invitation of Jack Planagan into your home or upon your premises

412

during that period of 6 years. A. No sir. . . . Q. By Mr. Veitch: During that period of 6 years of which you are speaking, did you ever request Jack Planagan to go home or to leave, at least, your premises? (Objection of defense counsel overruled.) . . . A. I have on occasions called my children in to get rid of him. (Answer stricken upon motion of defense counsel.) . . . A. I never definitely told Jack Planagan to go home with the exception of once. Q. Was that the occasion about which you told us yesterday, 6 years ago? A. Yes sir. —— no sir; then the night before she died I told him to go home. Q. That was the night before she died? A. Yes, and then on one other occasion 6 years ago.''

█ Appellant urges that ''a showing of a mere opportunity to commit a crime is insufficient to justify a verdict of guilty.'' It is the law that evidence showing an opportunity to commit the crime does not justify a conviction *apart from other circumstances,* unless it excludes all reasonable opportunity for its commission by another. (*People* v. *Tom Woo,* 181 Cal. 315, 328 [184 P. 389]; *People* v. *Tarbox,* 115 Cal. 57, 63 [46 P. 896]; *People* v. *Silva,* 48 Cal.App. 728, 737 [192 P. 330].) █ Even though it were conceded that no one of the facts, hereinbefore summarized, standing alone, would be sufficient to uphold the verdict, nevertheless, when all the circumstances which the jury may have resolved from the evidence are considered together, it cannot be held on this appeal that they were not sufficient to warrant an inference of guilt.

█ Appellant next calls attention to the rule that the circumstances relied upon to establish the guilt of one accused of crime must be consistent with that hypothesis and inconsistent with any other rational conclusion. In other words, where the incriminatory circumstances relied upon are equally compatible with innocence, a reviewing court will reverse a judgment of conviction, and a like application of that rule to this case, it is claimed, would impel a reversal of the judgment.

The rule above announced, as pointed out in *People* v. *Newland,* 15 Cal.2d 678, 682 [104 P.2d 778], quoting from *People* v. *Perkins,* 8 Cal.2d 502, 519 [66 P.2d 631], ''is a rule of instruction for the jury, and is not the rule for the guidance of the court on review.'' The rule ''does no more than to instruct the jury that, if a reasonable doubt is created in their minds for any reason, they must acquit the defendant. But,

where the jury rejects the hypothesis pointing to innocence by its verdict, and there is evidence to support the implied finding of guilt as the more reasonable of the two hypotheses, this court is bound by the finding of the jury.''

In *People* v. *Martinez,* 20 Cal.App. 343, 344 [128 P. 952], it is said: ''Where the circumstances are such as to reasonably justify an inference of guilt, as found by the jury, the fact that an inference of innocence might likewise be reasonably drawn therefrom does not present a question of law for review by an appellate court any more than does a verdict based upon direct conflicting evidence; in neither case will the verdict be disturbed. We are not unmindful that the Supreme Court in *People* v. *Staples,* 149 Cal. 405 [86 P. 886] employs language seemingly inconsistent with this view, and upon which appellant claims that if upon review this court is of the opinion that the circumstances are reasonably compatible with defendant's innocence, then, notwithstanding the fact that they reasonably justify the inference of guilt drawn therefrom by the jury, he is entitled to a reversal of the judgment. In reply to this we quote with approval the language used by Judge Chipman in *People* v. *Muhly,* 15 Cal. App. [416], 419 (114 P. [1017], 1018), where, in discussing the Staples case, he says: 'We do not understand that case to hold that where the circumstances are such as to reasonably justify the inference of guilt, the case will be taken from the jury because an inference of innocence might also reasonably have been drawn. Between these two inferences the jury must choose, and it is only where the evidence obviously does not warrant the inference of guilt that the court will interfere. This must be so, or the weight of circumstantial evidence, and the inference to be drawn from it in almost every case, must finally be determined by the appellate court, thus making the court the arbiter of both law and fact.''

In the instant case the circumstances established by the evidence reasonably justified the conclusion of the jury as expressed in their verdict.

 Appellant next contends that the court erred in admitting in evidence over his objection People's Exhibit 21, a spring-bladed knife. Officer Hargett testified that in a conversation he had with appellant, the latter told him that he owned three knives, a pocket knife, a spring-back knife with a

snap blade, and a hunting knife in a brown scabbard; that the regular knife and the spring-back knife were at home, but that he lost the hunting knife on Friday previous to the homicide. Appellant testified that he had had three or four knives; that he bought a push-button spring knife about a year before but had it only a few months when he broke it and threw it away, and that he bought a hunting knife after that. On cross-examination, he testified that he had two spring-bladed knives, one he threw away and guessed that the other was at his home at the time of his arrest; and that the snap that held up the blade on the knife which was at his home was broken. He was shown the spring-bladed knife and testified that the catch was broken and it did not lock; that he did not know whether the blade on this knife was as long as the blade on the hunting knife. The broken spring-back knife was then offered in evidence by the prosecution, to which the defense objected on the ground it was immaterial. The court overruled the objection stating that the direct examination of the appellant specifically referred to two knives which he had possessed.

Appellant argues that the error of the court in allowing this knife to be placed in evidence becomes more pronounced in view of the prosecuting attorney's argument to the jury, in which he stated: "And when that body received these awful wounds upon the head, I maintain that that evidence alone, 13-A and 13-B show us that as she sat there she got knife cuts; that knife that has a blade as big as this which perhaps Mr. Hurst—I want to show the size of the knife it would take to make those cuts. Those cuts are from three-quarters of an inch to better than an inch. It would take a blade as big as the one that is there in this Exhibit 21 to do that sort of work. It was the hunting knife of this defendant built to order for that purpose and carried by him upon him."

"Tools and instruments of crime found in the possession of or under the control of the defendant soon after the commission of the offense may be offered in evidence whenever they constitute a link in the chain of circumstances which tend to connect him with the commission of the offense charged. But before they can be received in evidence, it must be shown that the crime charged was in fact committed, and that it was committed with the aid of instruments like those pro-

posed to be shown in evidence, and that the defendant was in the vicinity at or about the time the offense was committed.'' (8 Cal.Jur. 144.)

Since the evidence showed that appellant had several knives and had broken some and lost others, particularly the hunting knife, but had a broken spring-bladed knife at his home, the admission of this latter knife in evidence was for the purpose of showing the jury the type and kind of knives possessed by appellant. The prosecuting attorney in his argument used the knife, People's Exhibit 21, in speaking of the cuts found in the body of the deceased, and that these cuts were made by a blade as large as the one in evidence. The admission of this knife was within the sound discretion of the trial court.

''Physical objects which form a part of, or serve to illustrate, the transaction or occurrence which is the subject of investigation may be formally introduced in evidence, and it rests in the discretion of the trial judge whether they may be carried from the bar by the jury on its retirement. As to its competency, demonstrative evidence is measured by all the qualifications prescribed by law, and it must always be relevant to the issue. . . . where it is competent, tends to throw light on, and has a direct bearing upon, a material issue, it is admissible and is not to be excluded because of its other effects on the jury.'' (Wharton's Criminal Evidence, 11th ed., vol. 2, p. 1275.)

Appellant contends that the evidence produced at the trial herein is insufficient to support the verdict and the judgment. In determining this question, it is incumbent upon this court to keep in mind and be guided by the rule that after the finding of the jury has been approved by the trial court on a motion for a new trial it is conclusive on appeal, and an appellate court may disturb it only when it can be said as a matter of law that there was no sufficient and substantial evidence to support it. We must assume in favor of the decision of the jury the existence of every fact which the jury could reasonably have deduced from the evidence and then determine whether guilt is deducible therefrom. (*People* v. *Walsh*, 50 Cal.App.2d 164, 169 [122 P.2d 671]; *People* v. *Hennessey*, 201 Cal. 568 [258 P. 49]; *People* v. *Rose*, 26 Cal.App.2d 513 [79 P.2d 737]; *People* v. *Tedesco*, 1 Cal.2d 211 [34 P.2d 467].)

As stated by the Supreme Court in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] : ''The rule applicable where there is evidence, circumstantial or otherwise, that a crime has been committed and that the defendant was the perpetrator thereof, has been many times reiterated by the reviewing courts of this state as follows: The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of *insufficiency of the evidence,* 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and second, that it was perpetrated by the person or persons accused thereof. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.'' (Citation of authorities.) (Italics ours.)

The record discloses that appellant was not wanted at the Courtemanche home. Pete Courtemanche did not care to associate with him. Apparently the only member of the family that appellant was interested in was Doris. He visited her at her home in the absence of other members of the family. He did not think she should go out with other boys, because she was too young. He called for her under her bedroom window two nights before she was slain, and was told to go home by her mother. On the day before the homicide, appellant was in the living room of the Courtemanche home ruffling up Doris' hair in a playful mood, and was there when Marilyn Courtemanche came home from work. However, he left be-

fore Mrs. Courtemanche came home. On the day of the homicide, instead of going to the beach where Pete Courtemanche and Frank Cordero were spending the day, appellant went to see Doris. In looking through the window he saw the body on the floor near the divan in the living room. He entered the house, lifted the cover, saw it was a girl's body and left by the front door. He got on his bicycle and rode away, not toward his home but away from his home, then felt sick to his stomach and went home where he was met by his mother. He looked pale and ill and when his mother asked him what was wrong he told her he had hit a woman while riding on his bicycle, which he later admitted was a false story. He went to bed, took a nap for ten or fifteen minutes, drove to the dairy with his brother to get some milk, went to town and paid some bills for his mother, went to a schoolyard with his brother and played handball, returned home, his mother served dinner but he could not eat, went to a moving picture show with his brother, returned home and went to bed. During this time he disclosed to no one what he had seen in the Courtemanche home earlier in the day. He did not tell his father because he did not want to bother or worry him. He did not disclose what he had seen until the next morning when his father questioned him. The black leather jacket which he was wearing the day of the homicide had splatters of human blood on it and there was human blood on the right cuff which had saturated into the lining on the sleeve on the inside of the jacket. Inside the zipper pocket of the jacket were spots of human blood, as well as on appellant's trousers over the right side pocket and over the right rear pocket. When asked about the spatter stains on his jacket by forensic chemist Pinker, appellant said he had no explanation to make. Appellant told Mr. Pinker he knew there were blood stains on his jacket and when asked why he didn't wash the stains off, he replied: "Well, you can't wash blood off. Blood is blood." Appellant testified that he did not remember whether blood was dripping or running from the blanket covering the body; that he was not sure that the body he saw was that of Doris Courtemanche; that he guessed a murder had been committed; that he didn't remember how long a time elapsed from the time he saw Mrs. Worden until he walked out the front door of the Courtemanche house, whether it was as much as half an hour

or not; that he did not tell Mrs. Worden what he had seen; that he saw Mrs. Nolton when he was leaving the Courtemanche house after his discovery of Doris' body; but that he made no outcry. It was conclusively established that Betty Jane Worden at 11:00 o'clock on the morning of April 21, 1943, saw Doris Courtemanche "out by that little white fence that is on the edge of the cliff"; that Mrs. Olson saw Doris walking her dog at 11:25 o'clock that morning about a block from the Courtemanche home; that Mrs. Worden saw appellant approaching the Courtemanche house at 11:30 o'clock, and that the dead body of Doris Courtemanche was discovered by her brother, Robert Courtemanche, at 12:28 o'clock that day; that Robert Courtemanche notified the police and that officer Gannon and Lieutenant Elliott arrived at the Courtemanche home at 12:35 or 12:40 o'clock.

The evidence produced at the trial definitely placed appellant at the scene of the homicide, and, although mainly circumstantial, it was sufficient from which the jury could find appellant's guilt beyond a reasonable doubt and to a moral certainty.

While there is nothing in the record to indicate that the jury reached its verdict as the result of passion or prejudice and it is also clear that the black leather jacket was introduced in evidence without objection, nevertheless this court condemns the practice followed in this case of placing pieces of *red* cellophane upon the said jacket to mark the blood stains thereon which were not visible to the naked eye. It would appear that these stains or spatters might have been marked in some less conspicuous manner in order to obviate the gruesome appearance which this jacket presented to the eyes of the jury, covered, as it was with these red markers which simulated the appearances of blood.

In his closing brief appellant's counsel makes the statement that appellant "was subjected continuously and with shameful pertinacity to the unconstitutional inquisition of a group of husky adult men, as many as five in number at a time, so that the lad was unable to have any normal mental reaction," etc. The record does not disclose any foundation for this complaint. On the contrary, appellant testified that he was not afraid of any of these officers and that he did not remember any unkind

act displayed toward him when he was being questioned by them during the period from April 22 to April 30, 1943.

No prejudicial error appearing in the record and the evidence being sufficient to sustain the verdict of the jury, the judgment and order appealed from are, and each of them is, affirmed.

Doran, J., concurred.

WHITE, J.—I dissent. Concededly, this is a case wherein circumstantial evidence alone is relied upon to sustain the conviction. It is also conceded that no motive whatsoever was shown for the commission of the homicide by the defendant. In connection with the absence of motive, our Supreme Court, in the case of *People* v. *Albertson*, 23 Cal.2d 550, 567 [145 P.2d 7], uses this language:

"In considering the sufficiency of this evidence to prove the guilt of Albertson, it is pertinent to note the startling fact that no motive whatsoever is shown. . . .

"The absence of motive, it may be conceded, furnishes but one element for consideration by the jury in connection with the other circumstances in the case, and if proof of guilt is otherwise sufficient to overcome the presumption of innocence the defendant must stand convicted notwithstanding no motive has been shown. But, nevertheless, 'absence of motive tends to support the presumption of innocence' (*People* v. *Tom Woo*, 181 Cal. 315, 328 [184 P. 389], or as stated in *People* v. *Kelley*, 208 Cal. 387, 390-391 [281 P. 609], a case relied upon by the prosecution, 'The absence of proof of motive is a fact to be reckoned on the side of innocence.' "

In this state of the record, I am impressed that any errors of law committed during the trial might well assume proportions which could have turned the scales in favor of the prosecution and militated prejudicially against the defendant's substantial rights. While the law makes no distinction between direct and circumstantial evidence in the degree of proof required for conviction and only demands that proof of guilt be established beyond a reasonable doubt by evidence of the one character or the other, or both, it is nevertheless, elementary law that the circumstances relied upon to establish the guilt of the accused must be consistent with that hypothesis and inconsistent with any other rational conclusion.

In his opening statement to the jury, the district attorney referred to an incident which had occurred some six years prior to the homicide and in connection with which the district attorney said, *"There is evidence in this case that the little girl came screaming to her mother from the upper floor of the garage on these premises where the defendant was, a short distance back of her, and cast herself into her mother's arms and told her mother certain things."* This matter is referred to at some length in the main opinion.

When during the trial, the district attorney sought to introduce evidence of the incident just mentioned, vigorous objection was made by the defendant. After discussion outside the presence of the jury, the court ruled that the prosecution could not introduce evidence of the incident in question other than as to what the mother of the deceased said to the defendant, admonishing him to remain away from the Courtemanche premises. In order to overcome any inferences the jury might draw from what the district attorney said in his opening statement, the defendant offered the following instruction, which was refused:

"The District Attorney in his opening statement said that there would be evidence presented in this case that 'the little girl had come screaming to her mother from the upper floor of the garage on those premises where the defendant was, a short distance back of her, and cast herself into her mother's arms and told her mother certain things. Her mother walked up to Planagan and took him by the arm and told him, Planagan, "Don't you ever come on these premises again. Don't you ever put your hand on any of my children" and then reached up and twitched his ear. She said "Do you feel that? I don't know what I should do to you to make you understand, but if you ever come back here and touch one of my babies again I will cut that ear off. Now, you get out and stay out." From that moment on Planagan was unwanted on the place and knew it.'

"You are instructed that no evidence or testimony has been adduced to establish these facts which the District Attorney stated he would prove, and that there has been a failure of proof in this respect. For this reason you are instructed to entirely and absolutely disregard the statement of the District Attorney as to these facts, nor are you to draw any inference that these facts may be true."

This instruction should have been given. The prejudicial effect of what the district attorney said in his opening statement with reference to "The little girl had come screaming to her mother from the upper floor of the garage on those premises where the defendant was, a short distance back of her, and cast herself into her mother's arms and told her mother certain things" was intensified by the discussion attending the objection made by the defendant when it was sought, during the trial, to introduce testimony of the incident into evidence. While it is true the judge did give a certain instruction as set forth in the majority opinion and which is read to juries in practically all cases, it is my opinion it did not cover the prominent and necessary features of the instruction which was offered and refused.

The defendant also requested the trial court to instruct the jury that the defendant was of the age of fifteen years; that a boy of that age is not presumed or required by law to exercise the same "judgment, discretion, consideration or acumen" in his actions or reactions, conduct or statements, that would be exercised by a person of more mature age under the same circumstances but is only required to exercise that degree of judgment and discretion which would ordinarily or usually be exercised by a youth of the age of fifteen years acting under the same circumstances. The court refused to give this or any similar instruction.

I am impressed that the proffered instruction contains a correct statement of the law and that the jury should have been so advised. The refused instruction assumed much importance because the jury was required to consider, as a link in the chain of circumstantial evidence, the reactions, conduct and behavior of the minor defendant, when, according to his testimony, he discovered the lifeless body of the deceased. I am convinced that, in giving consideration to such evidence, the jury should have been admonished as to the law applicable thereto when the actor therein was of the more or less immature age of fifteen years.

I am further convinced that the court should have instructed the jury as requested by the defendant, that their personal opinions as to facts not proven cannot properly be resorted to as the basis for a verdict; that although, as men and women, they might believe that certain facts exist, nevertheless, as

jurors, they could only act upon the evidence introduced at the trial, and upon that and that alone, their verdict should be based. While it is true that in a general instruction given in practically every criminal trial the court, in the course of such instruction, counselled the jury "You are to be governed, therefore, solely by the evidence introduced in this trial and the law as given you by the court," it is my belief that, because of the nature of this case, the circumstantial character of the evidence introduced, and the absence of motive, the court should have specifically warned the jury to beware of acting upon anything except the evidence introduced at the trial and inferences legally deducible therefrom, in arriving at their verdict. In a case such as the instant one, where the evidence is entirely circumstantial, and the lack of motive tends to support the presumption of innocence, the court should meticulously guard against the possibility of resort being had by the jury to considerations other than the evidence introduced at the trial in arriving at their verdict.

It is also my opinion that prejudicial error resulted from the introduction of People's Exhibit 21, a spring-bladed knife, under the circumstances set forth in the majority opinion herein.

In his closing argument, the district attorney exhibited the knife to the jury and said "It would take a blade as big as the one that is there in exhibit 21 to do that sort of work. It was the hunting knife of this defendant built to order for that purpose and carried by him, upon him." The error of admitting this knife as an exhibit lies in the fact that there was no evidence identifying the knife admitted into evidence with the crime under investigation. (*People* v. *Hill*, 123 Cal. 571 [56 P. 443].) Consequently, the jury could only conjecture that it, or one like it, was used by the defendant.

With reference to the manner in which the trial was conducted, the majority opinion, while holding that it cannot be said the jury arrived at its verdict as the result of passion or prejudice, nevertheless, in reference to the manner in which the defendant's black leather jacket was introduced into evidence, my associates have this to say, ". . . This court condemns the practice followed in this case of placing *red* cellophane upon the said jacket to mark the blood stains thereon which

were not visible to the naked eye. It would appear that these stains or splatters might have been marked in some less conspicuous manner in order to obviate the gruesome appearance which the jacket presented to the eyes of the jury, covered, as it was, with these red markers which simulated the appearance of blood.'' Conduct of a trial which merits such vigorous condemnation does not impress me as being of that type of judicial investigation which the law contemplates and which seeks to arrive at the truth.

Guilty or innocent, appellant was entitled to have his case fairly tried according to the established rules of law. That unfair means may have resulted in doing justice to a defendant in a particular case, furnishes no valid argument for resorting to such means, because justice so attained is unjust and dangerous to the whole community. That respect for the law cannot be inspired by withholding the protection of the law, recognizes no exceptions. True, the acquittal of a guilty person is a miscarriage of justice, but we should not forget that the conviction of an innocent person through relaxation of those fundamental legal principles, with which we are here concerned, would be a tragedy.

With reference to section 4½ of article VI of the Constitution, it is not my understanding that the same is intended to mean that merely because the evidence may legally be able to stand up under the weight of the judgment, that is sufficient reason in all cases for refusing to set aside the judgment. (*People* v. *Davis,* 210 Cal. 540, 556 [293 P. 32].) As was said in *People* v. *Wilson,* 23 Cal.App. 513, 524 [138 P. 971], ''The phrase, 'miscarriage of justice,' does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. *It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused in a given case to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time illegally deprive them of life or liberty.* 'It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be

respected.' (Opinion written by Mr. Justice Sloss in *People* v. *O'Bryan,* 165 Cal. 55 [130 P. 1042].)'' (Italics ours.)

When a defendant is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law. (*Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].)

I am persuaded that it is not for this court to say whether we think that the defendant is guilty, and nothing herein said by me is to be taken as indicating any opinion one way or the other on the question of his actual guilt. It is, however, my judgment that, had the jury been instructed as heretofore set forth, and had the errors·of law upon the admission into evidence of the knife not been committed, such instructions and the absence of such errors would have added a substantial item to the balance in defendant's favor, and who can say but what a different verdict might have been rendered. This I assert because of the fiendish, brutal, and depraved character of the murder with which we are here concerned. Appellant was charged with that murder. If guilty at all of this cruel and inhuman crime, he was guilty of first degree murder. Strictly speaking, there was no middle ground. However, the jury found appellant guilty of only second degree murder. Here, indeed, was a remarkable verdict. To me, the verdict rendered showed nothing if it did not indicate a doubt in the minds of the jurors as to the correctness of their solution of the problem submitted to them. Was such doubt engendered by the errors to which I have alluded? Who can say?

In my opinion, the judgment and the order denying a new trial should be reversed and the cause remanded for a retrial devoid of such errors and consequent prejudice.

Appellant's petition for a hearing by the Supreme Court was denied September 1, 1944. Carter, J., and Traynor, J.. voted for a hearing.